**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| **WILLIAM A. BARNES,** | |
| Plaintiff, | |
| v. | Civil Action 5:10-CV-408 (HL) |
| **CARMEUSE LIME & STONE, INC.,** | |
| Defendant. | |

**ORDER**

This case is before the Court on Defendant's Motion for Summary Judgment (Doc. 38). For the reasons discussed herein, the Motion is granted.

**I.   BACKGROUND**

On October 28, 2010, Plaintiff filed a pro se complaint against his former employer, Carmeuse Lime & Stone, Inc., pursuant to Title VII of the Civil Rights Act of 1964, as amended, claiming that he was discriminated against because of his race.

Plaintiff later retained counsel, who filed an amended complaint alleging a hostile work environment, discriminatory failure to promote, and retaliation, all in violation of Title VII and 42 U.S.C. § 1981. However, the relationship between Plaintiff and his counsel crumbled, and Plaintiff is now once again representing himself.

After the close of discovery, Defendant moved for summary judgment on all of Plaintiff's claims. The Court notified Plaintiff about the motion and the possible

consequences if he failed to respond. Plaintiff filed a three page response to Defendant's motion, but did not respond to Defendant's statement of material facts. Therefore, pursuant to Local Rule 56, those facts are deemed admitted. M.D. Ga. L.R. 56.[1]

Even though Defendant's submitted facts are deemed admitted, Defendant "continues to shoulder the initial burden of production in demonstrating the absence of any genuine [dispute] of material fact, and the court must satisfy itself that the burden has been satisfactorily discharged." Reese v. Herbert, 527 F.3d 1253, 1268 (11th Cir. 2008). The Court must "review the movant's citations to the record to determine if there is, indeed, no genuine issue of material fact." Id. at 1269 (quotation and internal quotation marks omitted). The Court has so reviewed the record, and viewed in the light most favorable to Plaintiff, finds the facts for purposes of summary judgment to be as follows.

## II. FACTS

Defendant operates manufacturing and mining facilities throughout North America that produce lime and limestone for use in various industries, including construction, waste treatment, water treatment, paper production, flue gas desulfurization, and mine safety. (Declaration of Dawn Haden Sellers, ¶ 3). Defendant owns and operates a plant in Macon (the "Macon Plant") that produces

---

[1] "All material facts contained in the moving party's statement which are not specifically controverted by specific citation to the record shall be deemed to have been admitted, unless otherwise inappropriate." M.D. Ga. L.R. 56.

hydrated lime, a product used for road construction. (Sellers Decl., ¶¶ 4-5). The Macon Plant receives powdered quicklime by rail from Defendant's mine in Luttrell, Tennessee (the "Luttrell Facility"). (Sellers Decl., ¶ 5). A plant operator unloads the quicklime from the rail cars and feeds it through the plant's hydrator. (Id.) The finished product, known as hydrated lime, is transported from the Macon Plant to Defendant's customers via tanker trucks that are loaded at the plant by plant operators. (Id.) The tanker trucks are not owned by Defendant, and Defendant does not employ the truck drivers. (Id.) Instead, Defendant contracts with different companies for the trucking services. (Id.)

Defendant acquired the Macon Plant and the Luttrell Facility in February of 2008. (Sellers Decl., ¶ 6). At the time of the acquisition, there were four employees at the Macon Plant: Plaintiff, the Plant Operator Leadman; Chris Bowling, the Production Supervisor; Darrell "Wayne" Tucker, a Plant Operator I; and Johnny Parks, a Plant Operator I. (Id.) All four men were retained as employees in those positions. (Id.) Plaintiff and Tucker are black. (Sellers Decl., ¶ 7). Bowling and Parks are white. (Id.) Plaintiff was hired by the former plant owner in March of 2003 as a Plant Operator, and was subsequently promoted to Plant Operator Leadman in December of 2003. (Sellers Decl., ¶ 8).

Plaintiff, Tucker, and Parks reported to Bowling. As Production Supervisor, Bowling was generally responsible for directing the work of the plant operators and overseeing the day-to-day operations of the Macon Plant. (Sellers Decl., ¶ 9). However, Bowling did not have the authority to hire or fire employees at the Macon

3

Plant, was not considered a member of upper management, and was not a company official designated to receive and investigate discrimination and harassment complaints. (Id.)

Bowling reported to Brian Ball, the Area Operations Manager. (Id.) Ball was responsible for overseeing all aspects of the Macon Plant and the Luttrell Facility. (Id.) Ball's office was at the Luttrell Facility, but he traveled to the Macon Plant from time to time to address work related matters. (Declaration of Brian Ball, ¶ 5).

Dawn Sellers has been a Regional Human Resources Manager for Defendant since 2007. (Sellers Decl., ¶ 2). While her primary office is in Saginaw, Alabama, Sellers is responsible for overseeing all human resources functions at both the Macon Plant and the Luttrell Facility. (Sellers Decl., ¶¶ 2, 4). She assumed responsibility for human resources at the Macon Plant in June of 2008. (Sellers Decl., ¶ 10). Sellers went to the Macon Plant, introduced herself to Plaintiff and the employees, explained her position and duties, and gave the employees her contact information. (Id.) She returned to the Macon Plant occasionally to address human resources matters. (Id.)

On October 21, 2008, Sellers conducted a training session at the Macon Plant regarding Defendant's harassment, sexual harassment, and workplace violence policies. (Sellers Decl., ¶ 11). She explained the policies in detail to all of the employees, including Plaintiff, and gave them copies of the policies to keep. (Id.) Sellers gave out her contact information again and told the employees if they felt like they had been harassed, they should contact Brian Ball or her, the designated

4

management officials responsible for receiving and investigating discrimination and harassment complaints. (Id.) She explained that under the harassment policy, all forms of unlawful harassment, including racial harassment, are prohibited. (Id.) The harassment policy defines harassment as including "unwelcome slurs, jokes, verbal, graphic or physical conduct relating to an individual's race. . . ." (Sellers Decl., ¶ 11; Ex. 1). The policy states that employees who believe they have been subjected to harassment should immediately contact the Human Resources Manager or the Area Operations Manager. (Id.) Alternatively, employees could request the assistance of Corporate Human Resources by calling Defendant's toll free human resources hotline. (Id.) All four employees, including Plaintiff, signed an acknowledgment form on October 21, 2008 indicating that they had reviewed the harassment policy, that the policy had been explained to them, and that they understood their rights and responsibilities under the policy. (Sellers Decl., ¶ 11; Ex. 2).

On July 2, 2010, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Deposition of William A. Barnes, Ex. 6). He alleged that since January 1, 2010, he had been "subjected to a racially hostile work environment by contracted employees. I have complained several times to my Supervisor, Chris Bowling (White), most recently on June 1, 2010. He has not taken action." (Id.) Sellers received a copy of the EEOC charge on or about July 12, 2010. (Sellers Decl., ¶ 19). Prior to that date, neither Sellers nor Ball had received any complaints about alleged harassment from Plaintiff or anyone else at the Macon

Plant. (Sellers Decl., ¶ 20; Ball Decl., ¶ 6). Plaintiff admits that he had not raised any complaints with Sellers prior to that time. (Barnes Dep., p. 164).

Sellers immediately began an investigation into the harassment allegations. (Sellers Decl., ¶ 21). On July 22, 2010, Sellers and Debbie Perry, who works at the Luttrell Facility, met at the Macon Plant and interviewed all of the employees. (Id.) Plaintiff told Sellers and Perry that Rex Rhoden, a truck driver for Houston Transportation, had been harassing him. (Sellers Decl., ¶ 22). Rhoden is not an employee of Defendant, but rather works for a trucking company with which Defendant contracts to transport the hydrated lime. (Id.) Plaintiff stated that Rhoden had a song called the "Alabama Nigger Song" as the ringtone on his cell phone and that he had played the song on his phone in Plaintiff's presence while he was in the plant office waiting for his truck to be loaded. (Id.) Plaintiff informed Sellers and Perry that earlier in the year he found a log sheet with the phrase "I hate niggers" written on it. (Id.) One of the other truck drivers told Plaintiff that Rhoden had written the statement. (Id.) Plaintiff stated that he reported Rhoden's conduct to Chris Bowling, who did not do anything about it. (Id.) Plaintiff also claimed that he was not being paid at a double time rate of pay for the time he worked on Sundays, but Wayne Tucker received double time pay. (Id.)

Sellers and Perry interviewed the other plant employees. (Sellers Decl., ¶ 24). Tucker stated that he had heard Rhoden's ringtone and that it was supposed to be a joke. (Id.) Bowling stated that Plaintiff had never complained about Rhoden to him, and that he had never seen the log sheet with the racial slur on it. (Id.) At some point

6

during the investigation, Sellers learned that Rhoden and Plaintiff were friends and socialized together outside of the plant. (Sellers Decl., ¶ 26; Barnes Dep., p. 169).

At the end of the investigation, Sellers, Perry, and Ball, who was briefed on the interviews, could not determine whether a racially hostile work environment existed at the Macon Plant because of the conflicting information they received. (Sellers Decl., ¶ 27). Nevertheless, the decision was made to ban Rhoden from returning to the Macon Plant, and that decision was communicated to Houston Transportation. (Id.) Defendant also established a rule prohibiting truck drivers who were waiting for their trucks to be loaded from entering the office. (Id.) Sellers reiterated the company's harassment policy to all employees at the Macon Plant. (Id.) Plaintiff admits that the racial harassment stopped after the investigation. (Barnes Dep., pp. 168-69).

Shortly after Plaintiff filed the EEOC charge in July of 2010, Bowling resigned from the company for reasons unrelated to the harassment complaint. (Sellers Decl., ¶ 31). Defendant then posted the Production Supervisor position on its website in accordance with its regular job posting practices. (Id.) The listed requirements for the position included seven-plus years of direct production supervisory experience in a manufacturing environment with a focus on quality, safety, and environmental matters; an industry background in manufacturing; solid management skills with strong interpersonal skills; and a positive and proactive attitude. (Sellers Decl., Ex. 10). Other desired characteristics were a background in machine maintenance,

experience in developing and implementing safety programs, and general business skills. (Ball Decl., ¶¶ 9-10).

Defendant received approximately 90 applications for the Production Supervisor position, including one from Plaintiff. (Sellers Decl., ¶¶ 31-32). Plaintiff did not submit a resume or provide much information regarding his education or past job experience. (Sellers Decl., ¶ 32; Ex. 11). Plaintiff stated in his application that he was qualified for the Production Supervisor position because

> I HAVE WORKED HERE AT THE PLANT FROM MAR 03 TO PRESENT;IN WHICH I LOVE AND TAKE PRIDE IN DOING SO;I LOVE WORKING WITH PEOPLE AND WORKING TO MEET OR BEAT PRODUCTION GOAL;SOME OF MY EXP.THAT I USE HERE DAY 2 DAY (WELDING,PROBLEM SOLVING,TRAINING NEW HIRE, CHANGING OUT BEARINGS,OVER SEEING ALL PLANT OPERATION, WORKING ON MACHINERY, MAKIN SURE WORK AREA IS KEPT NEAT AND SAFE,CONTACTING DELORIES WHEN THE PLANT IS DOWN)ETC.

(Sellers Decl., Ex. 11).

Sellers and Ball reviewed the applications and selected applicants for interviews. (Sellers Decl., ¶ 33). They decided to interview Plaintiff because of his experience working at the Macon Plant. (Id.) They also interviewed Roy Wade, who is white. (Id.) As the Area Operations Manager, Ball was ultimately responsible for making the hiring decision. (Sellers Decl., ¶ 34; Ball Decl., ¶ 7). After interviewing the candidates and reviewing their credentials, Ball decided Wade was the best candidate for the position. (Sellers Decl., ¶ 34; Ball Decl., ¶ 9). He discussed the matter with Sellers, and she also agreed Wade was the best choice. (Sellers Decl., ¶

33; Ball Decl., ¶ 9). Wade had several years of supervisory experience in an industrial environment, a strong background in maintenance and safety, and experience with business management tasks such as budgeting, accounts receivable, and accounts payable. (Sellers Decl., ¶ 34). At the time of the interview, Wade was working as a Technical Engineer/Production Supervisor with YKK, Inc., where he directly supervised eight mechanics and 35 production employees, developed and implemented safety programs, and planned production and maintenance budgets. (Ball Decl., ¶ 9). Wade also owned and operated a 500-acre farm where he managed all aspects of the business, including hiring and management farm workers and performing administrative and business functions. (Id.) Plaintiff, on the other hand, had little supervisory experience and did not have comparable experience in maintenance, safety, or business administration. (Sellers Decl., ¶ 34; Ball Decl., ¶ 10). Further, while Plaintiff had technical experience from his years of working at the Macon Plant, the Production Supervisor position, which involves supervising day-to-day work, developing and implementing safety rules and programs, planning and budgeting for capital improvement projects, and communicating effectively with state agencies, customers, and carriers, required additional knowledge, skills, and training which Plaintiff did not have. (Ball Decl., ¶ 10).

Plaintiff filed a second charge with the EEOC on October 4, 2010, alleging that Defendant refused to promote him because of his race and in retaliation for previously filing an EEOC charge. (Sellers Decl., ¶ 35). Plaintiff contends he was the

best qualified candidate for the Production Supervisor position because he had worked at the Macon Plant for several years as a leadman and knew the plant "in and out." (Barnes Dep., pp. 192-93).

## III.  ANALYSIS

### A.  Summary Judgment Standard

Summary judgment must be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material facts and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). "A factual dispute is genuine only if 'a reasonable jury could return a verdict for the nonmoving party.'" Info. Sys. & Networks Corp. v. City of Atlanta, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991)). The burden rests with the moving party to prove that no genuine issue of material fact exists. Id. at 1224. The district court must "view all evidence in the light most favorable to the nonmoving party, and resolve all reasonable doubts about the facts in its favor." Id.

### B.  Title VII and 42 U.S.C. § 1981

Plaintiff brings his failure to promote, retaliation, and hostile work environment claims pursuant to Title VII and 42 U.S.C. § 1981. Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Under § 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and

enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The analysis for claims of race discrimination and retaliation under Title VII and § 1981 is the same, Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998), and the Court's ruling applies equally to both legal theories.

### 1.     Failure to promote

Plaintiff contends Defendant failed to promote him to the Production Supervisor position because of his race. Where, as here, a party seeks to establish discrimination through circumstantial evidence, the Court evaluates the claim under the framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973).

Under the McDonnell Douglas test, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001). Once a plaintiff has established a *prima facie* case, the employer must articulate a legitimate, nondiscriminatory reason for the challenged employment action. Id. If the employer can give an appropriate explanation, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's explanation is merely a pretext. Id. A plaintiff cannot establish pretext by simply demonstrating facts that suggest discrimination, but must specifically respond to the employer's explanation and rebut it. Crawford v. City of Fairburn, Ga., 482 F.3d 1305, 1309 (11th Cir. 2007). Pretext evidence is that which demonstrates "such weaknesses, implausibilities, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable fact

finder could find them unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (citation omitted). It is important to remember that an employer may make an employment decision for a "good reason, a bad reason, . . . or no reason at all as long as its action is not for a discriminatory reason." Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000) (quotation omitted).

For a failure to promote claim, the plaintiff establishes a *prima facie* case by showing that: (1) he is a member of a protected group; (2) he was qualified for and applied for the promotion; (3) he was rejected in spite of his qualifications; and (4) the person who received the promotion was not a member of the plaintiff's protected group. Walker v. Mortham, 158 F.3d 1177, 1185-93 (11th Cir. 1998).

Assuming for the sake of argument that Plaintiff can establish his *prima facie* case, Defendant has articulated legitimate, nondiscriminatory reasons for denying Plaintiff the promotion, namely that Plaintiff was not qualified for the position, Wade had superior qualifications, and Wade had the necessary supervisory experience, maintenance background, business background, and safety background desired by Defendant for the new Production Supervisor. Plaintiff must now show that Defendant's proffered reasons were pretexts for discrimination on the basis of race. He cannot do so.

In a non-selection case, the plaintiff cannot establish pretext by "simply arguing or even by showing that he was better qualified" than the selectee. Springer v. Convergys Customer Mgmt. Group, 509 F.3d 1344, 1349 (11th Cir. 2007) (quotation omitted). To show pretext by asserting superior qualifications, a "plaintiff

must show that the disparities between the successful applicant's and [his] own qualifications were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." Brooks v. County Comm'n of Jefferson County, Ala., 446 F.3d 1160, 1163 (11th Cir. 2006) (quotation marks and citation omitted).

Plaintiff has not met his burden to show that the disparities between his qualifications and Wade's qualifications were so severe that no reasonable person could have chosen Wade over him. The fact Plaintiff subjectively believes he was the most qualified candidate holds no weight. *See* Brooks, 446 F.3d at 1163-64 (the inquiry at the third stage of the McDonnell Douglas analysis of a failure to promote claim is not concerned with the plaintiff's belief that she was more qualified than the person hired). It is not enough for Plaintiff to argue with Defendant's decision - a plaintiff cannot establish pretext by questioning the wisdom of his employer's decisions. Further, it is not for this Court to sit "as a super-personnel department that reexamines an entity's business decisions. . . ." Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991). Defendant is entitled to summary judgment on the failure to promote claim.

### 2. Retaliation

Plaintiff alleges Defendant did not promote him to the Production Supervisor position in retaliation for Plaintiff's filing of the EEOC charge in July of 2010. Title VII prohibits employers from discriminating against an employee: (1) "because he has opposed any practice made an unlawful employment practice," or (2) "because he

has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). To establish a claim of retaliation under Title VII, a plaintiff must show that he "engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events." Goldsmith v. Bagby Elevator Co., Inc., 513 F.3d 1261, 1277 (11th Cir. 2008). After the plaintiff establishes these elements, the employer has an opportunity to articulate a legitimate, nonretaliatory reason for the challenged employment action as an affirmative defense to liability. Id. (citing Coutu v. Martin County Bd. of County Comm'rs, 47 F.3d 1068, 1073, 1075 n. 54 (11th Cir. 1995)). The plaintiff must then show that the reason provided by the employer is a pretext for the prohibited retaliatory conduct. Id.

For purposes of summary judgment, Defendant has conceded that Plaintiff can establish a *prima facie* case of retaliation. However, as discussed above, Defendant has provided legitimate nonretaliatory reasons for not promoting Plaintiff to the Production Supervisor position and hiring Wade instead. Plaintiff has provided no evidence that would "allow a factfinder to disbelieve [Defendant's] proffered explanation for its actions." Combs, 106 F.3d at 1532. "A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom

14

of that reason." Chapman, 229 F.3d at 1030. As Plaintiff has not demonstrated pretext, Defendant is entitled to summary judgment on the retaliation claim.

### 3. Hostile work environment

A hostile work environment claim is established upon proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367 (1993)). A plaintiff wishing to establish a hostile work environment claim must show: (1) that he belongs to a protected group; (2) that he has been subjected to unwelcome harassment; (3) that the harassment was based on a protected characteristic of the employee, such as national origin; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or direct liability. Miller, 277 F.3d at 1275. Defendant contends Plaintiff cannot establish the fourth element of his hostile work environment claim.[2]

---

[2] Defendant also argues that Plaintiff cannot establish the fifth element of the claim, that Defendant was responsible for the environment, but as the Court finds that the fourth element has not been established, it is not necessary to address the additional argument.

The fourth element, which requires that the harassment be sufficiently severe or pervasive to alter the terms and conditions of employment, contains both subjective and objective components. Bryant v. Jones, 575 F.3d 1281, 1297 (11th Cir. 2009). The harassment must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceived to be abusive. Id. The objective element "is not subject to mathematical precision," but the court can infer that an environment is hostile or abusive from the circumstantial facts viewed in their proper context. Id. (citation omitted). The court must look to factors such as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. (quotation omitted). The Eleventh Circuit described a hostile work environment as one where, "[f]or example, the racial slurs allegedly spoken by coworkers [were] so commonplace, overt and denigrating that they created an atmosphere charged with racial hostility." Edwards v. Wallace Cmty. Coll., 49 F.3d 1517, 1521 (11th Cir. 1995) (quotation omitted).

Plaintiff's hostile work environment claim is based on the following: (1) Rhoden used "Alabama Nigger Song" as the ringtone on his cell phone, and played it five to seven times in Plaintiff's presence; (2) finding the log sheet with "I hate niggers" written on it; and (3) Tim Bartlett, another Houston Transportation driver, commented on one occasion that his truck "smelled like ass and nigger feet." (Barnes Dep., pp. 151-155, 159, 161). With regard to Bartlett's comment, Plaintiff testified that Bartlett

16

made the statement "accidentally" and immediately apologized to Plaintiff. (Barnes Dep., pp. 151-52).[3] However, according to Plaintiff, these incidents did not adversely affect his job performance. Plaintiff's job responsibilities included unloading the rail cars, loading the tanker trucks, and fixing things in the plant when they broke. (Barnes Dep., pp. 99-101, 176). Plaintiff testified that the alleged racially hostile work environment did not impact his ability to perform his regular job duties, as he was still able to fix things, unload the lime, and load the trucks. (Barnes Dep., p. 176).

Based on the evidence before it, the Court finds that the alleged harassment, while certainly not commendable, was not sufficiently severe or pervasive as to alter the terms and conditions of Plaintiff's employment. Plaintiff has presented evidence of only isolated incidents of harassment. The harassment was not in any way physically threatening, but instead consisted of offensive utterances. Plaintiff admitted that the comments did not interfere with his job performance at all. In fact, he testified that he "didn't pay it no mind," and had "learn[ed] to overlook it." (Barnes Dep., p 153). Plaintiff's claim is further undermined by his testimony that he socialized with Rhoden, who was the main culprit behind the alleged discrimination.

The incidents complained of by Plaintiff were not especially severe when compared to other conduct courts in the Eleventh Circuit have found to fall short of the "severe" harassment standard. For instance, in Barrow v. Georgia Pacific Corp.,

---

[3] Plaintiff also asserts that Defendant's failure to pay him double time for two Sundays is evidence of a racial hostile work environment. The Court agrees with Defendant that this is

144 Fed. Appx. 54 (11th Cir. 2005), one black plaintiff-employee alleged that he saw displays of the rebel flag on tool boxes and hard hats, the letters "KKK" on a bathroom wall and block-saw console, and a noose in another employee's locker. He also testified that supervisors called him "boy," "nigger," "dumb ass," and "black boy," and threatened to kick his "black ass." Id. at 57. Other black plaintiff-employees testified that they saw the letters "KKK" and confederate flag decals, and suffered isolated, sporadic racial slurs. Nevertheless, the Eleventh Circuit found that the plaintiffs had not established a hostile work environment claim. Id.

It must also be noted that Plaintiff failed initially to report the harassment according to the procedures outlined in Defendant's harassment policy, as he did not report the problem directly to Dawn Sellers or Brian Ball or call the corporate hotline. And once Sellers was made aware of the harassment, an investigation was immediately conducted and the problem was promptly remedied.

The Eleventh Circuit has set a very high standard when it comes to establishing a hostile work environment claim, and Plaintiff's allegations simply do not meet that standard. As Plaintiff has failed to show that he was subjected to sufficiently severe or pervasive conduct, he has not established a hostile work environment claim. Defendant is entitled to summary judgment on this issue.

---

not objective evidence of racial hostility, especially as the worker who was paid double time, Wayne Tucker, is also black.

## IV. CONCLUSION

For the reasons discussed above, Defendant is entitled to summary judgment on all of Plaintiff's claims. Defendant's Motion for Summary Judgment (Doc. 38) is granted. The Clerk of Court is directed to enter judgment in favor of Defendant and close this case.

**SO ORDERED**, this the 4th day of April, 2012.

*s/ Hugh Lawson*
**HUGH LAWSON, SENIOR JUDGE**

mbh